IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

RECEIVED

| | |
|---|---|
| JUDY F. MANN | ) |
| PLAINTIFF | ) |
| | ) |
| | ) |

2006 OCT -3  A II: 15

~~DEBRA P. HACKETT, CLK~~
~~U.S. DISTRICT COURT~~
~~MIDDLE DIST. OF ALA.~~

VS.

2: 06CV 888 - m HT

MONTGOMERY ADVERTISER
DEFENDANT

COMPLAINT    DEMAND FOR JURY TRIAL


Judy Mann was hired by The Montgomery Advertiser on July 27, 1997 as a Credit Manager. The newspaper had been acquired by Gannett from Multi Media, and was in what the paper deemed a clean up situation. Kenneth Sharp was Judy's immediate Supervisor. Shortly after Judy reported to work she was asked by Publisher Thomas Bookstaver to assist Attorney Dennis Bailey of Rushton Stakely, Johnston & Garrett Law firm with a pending case against the paper (Montgomery Security Doors vs. The Montgomery Advertiser.)  Although Judy had a tremendous work load she agreed to help. Mr. Bookstaver helped with teaching Judy how the complicated rate structure worked and relating what he knew that led to the case being filed. Judy was working 12 to 14 hours per day and coming back after school at night to go to the warehouse to review records. There was little time to devote to the duties of Credit Manager. Kenneth Sharp resigned and so did the two collectors in the Credit Department. Judy managed to handle the priorities and keep her head above water with the assistance of two temporaries from a local employment agency.  She shared her concerns with Jerri Aldolph the Controller and received a pay increase of approximately 30%. Judy decided she would remain at the paper but chose a different role as a collector while still performing the duties of Credit Manager. Shortly after the meeting with Ms Aldolph she was replaced by Delinda Renner as the Controller for the Montgomery Advertiser. Ms. Renner referred to herself as the tornado and she  did not see the need to interview any existing employees. Judy's first meeting with Ms. Renner was during a monthly meeting in which Mr. Bookstaver made the announcement Judy  had won salesperson of the month . Joanne Walker was hired as the new Credit Manager and also the billing supervisor.

Joanne Walker   realized she was replacing two other Managers.   The Montgomery Advertiser at about the same time was holding a job fair to recruit new employees due to an approximate turn over rate of 69%.

The job fair was being manned by human resources director Fred Villicampa who hired Julie Washburn as Joanne Walker's replacement.

Judy was relieved that Ms. Washburn was on staff and the long hours would end so she could concentrate on the court case. Mr. Bookstaver asked Julie and Judy to meet him in the 2nd floor conference room a short while after she became Credit Manager. Mr. Bookstaver asked Julie how that was going, she replied "I'll tell you one thing if that bitch Jackie McLain does not keep that cash posted I will knock her f---ing head off." Mr. Bookstaver was speechless. He pushed his chair back never said a word and left the conference room. Julie said "Judy you don't think I said to much do you?".  "I have got a big mouth." Judy replied ,"We will just have to wait and see."

One day Judy returned from lunch to find a note on her desk from Julie that read, "Please help me or I will kill myself." She had asked Delinda how to write a credit and what credit limit to set for new customers. Delinda had Julie to call Judy at home and get the information. Meanwhile the Montgomery Security Door Case began. Judy continued to help Julie and fill her new role as a collector. Julie made it very clear she did not care about the case one way or the other and  Judy needed to concentrate on the duties she was assigned to. Judy was to testify as the Corporate Representative for the paper. The jury ruled in favor of the paper. This is when the retaliation started. The day after the case was won Julie walked by and said to Judy, "I need to see you in my office". She closed the door and said "I hope you know what you have done." "Bookstaver will never come to me again because of you." Judy responded, "What in the world are you talking about?" "I'm talking about winning that court case. "Julie you're wrong he will come to you, 'you are the Credit Manager."

The following day Judy received flowers from Mr. Bookstaver. Again,  Julie called her in the office this time to ask who sent the flowers. Julie continued to harass Judy and her health began to deteriorate .She decided to take sick days.  On returning to the office three days later Julie walked by Judy's desk and said " In my office missy." Judy told Julie she was not feeling well and asked if she could please discuss whatever the situation was later. Julie said no. To avoid conflict Judy requested that they both go into their superior's office,  Delinda Renner, and discuss the matter. Julie replied, "No I am your boss and you will resolve this issue with me". Judy's right to complain to anyone was continuously denied. Julie wanted to know why she had not taken the Credit Manager's Job. Judy explained to her that the timing was not right for any Manager to take the job.  Desperately seeking relief from Julie's harassment, and her retaliation by withholding Judy's bonuses that were due, increasing here work load and decreasing her pay, Judy requested a meeting with human resources where Julie threatened to fire her based on her complaints. The meeting was fruitless and Julie denied everything. Judy then asked for a transfer to the Prattville Progress owned by the Montgomery Advertiser.

The Ad Director at that time was Mark Logsdon who told Judy that he did not want her to leave the paper and asked her to become an ad assistant and move into a sales position within six  months at the same rate of pay plus bonuses reporting to Kathryn Mount.  Judy focused on the goal of becoming the best salesperson she could.  Her new

position was an entry level position that provided training to move into a sales position. In 2003 she was awarded Sales Person of the year. .

In August of 2004 Judy overheard a conversation between Jill McCord , Secretary to Ron Davidson and Sharon Waid involving an automobile customer that she believed to be an unlawful act. She then related that conversation to Dennis Bailey, who asked her to meet with Scott Brown the Publisher for the Montgomery Advertiser, and relay the information to him. On October 12, 2004 Judy had a meeting with Scott. Later that day Judy received an untimely performance review by her new supervisor Kathryn Mount. She believes that this review was in retaliation for the meeting she had with Scott. Mount, conducted this unfair review. (see attached). This performance review was based on the fact that Judy should be sales person of the year every year. One of the key factors relating to Judy's job performance was job knowledge. Job knowledge cannot decrease when the job description had not changed. She received a negative mark in team work , because she exercised her right to involve a higher up e.g. Scott to report an unlawful act. Judy knew this was retaliation because this review was due in September but occurred the same day of her meeting with Scott. Ms. Mount acted with malice and reckless indifference to Judy's federally protected rights. Jin Ku Kim v Nash Finch  Co., 123 f.3d 1046, 1066-67 8th Cir. 1997.

After the first performance review Judy's work place became increasing hostile. On the same day following suit, Kathryn again retaliated against Judy by creating another negative false performance review on October 28th 2004. (See attached) Again, directly after another meeting with Scott. Each negative performance review occurred after Judy exercised her right to complain to a higher up about being continuously harassed in the workplace.

Judy never received any negative comment from her customers. Every single negative mark on the afore mentioned performance notices were fabricated by Kathryn and can be addressed with proof of falsification.

Relief To be made whole.     JM     10/03/06
Demand For Jury Trial:

***All attachments to be provided upon request***

Plaintiff
Judy F. Mann Pro Se
278 South Wesson Street
Tallassee, Alabama 36078
Phone # 334-252-0499
Judy Mann     10/03/06
Judy Mann

Defendant
Montgomery Advertiser
425 Moulton Street
Montgomery, Alabama 36104
Phone # 334-262-1611
Attorney



employee-employer relationship has been irreparably damaged.  <u>Brooks v. Fonda-Futtonville</u>, 938 F. Supp. at 1108.  As to emotional distress damages, the employee may recover for loss of sleep, alienation from family members and friends, loss of reputation, mental anguish, loss of enjoyment of life, loss of health, depression, paranoia, high blood pressure, pain, etc.  <u>Salinas v. Rubin</u>, 126 F. Supp.2d 1026, 1029 (S.D. Tex. 2001).  The only limitation on recovery is the federal statutory cap.  Title VII limits damage recovery depending on the size of the employer. An employee may not recovery more than $300,000 if the employer has over 500 employees.  42 U.S.C. § 1981a.  This limit applies only to the federal claims, and if the employee has state law claims, he or she will not be limited by the federal statutory cap.

Punitive damages are often recovered in retaliation claims because retaliation constitutes a practice undertaken "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  <u>Jin Ku Kim v. Nash Finch Co.</u>, 123 F.3d 1046, 1066-67 (8th Cir. 1997) (finding reckless indifference to plaintiff's rights was supported by evidence of retaliation and concluding that, although $7 million award for punitive damages was excessive, district court's lowered award of $300,000 was not).  With such monetary exposure, employers should strive to prevent, resolve or neutralize retaliation claims.

## VI.    CONCLUSION

Employers should develop an internal policy against retaliation and a procedure for handling retaliation claims.  When an employee makes a discrimination or harassment complaint, it is wise to keep that complaint as confidential as possible, thereby reducing the risk that co-workers or supervisors would retaliate.  As always, employers should also document all communications with the complaining employee regarding his or her complaint and the subsequent investigation of the claim.  Such documentation will not only help the ensuing

23

1435646.1